UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

WILLIAM ERIC RODRIGUEZ A/K/A          Civ. Case No. 21-cv-1924 (BMC)
WILDON RODRIGUEZ,

                Plaintiff,

     -against-

THE CITY OF NEW YORK, DETECTIVE
JOSEPH YATES, POLICE OFFICER DANIEL
SACCO, DETECTIVE JOHN FERRARI,
as employees of the New York City Police
Department and Individually,
,

                Defendants.
---------------------------------------------------------------x


_____

**AMENDED COMPLAINT**
_____


ADAM J. ROTH, ESQ.
LAW OFFICES OF ADAM J. ROTH
112 Madison Ave, 6th Floor
New York, New York 10016
(212) 922-3741
ajr@loajr.com

*Attorney for the Plaintiff*

## TABLE OF CONTENTS

*Page*

NATURE OF ACTION ……………………………………………………………………… 1

JURISDICTION, VENUE and CONDITIONS PRECEDENT ………………………………… 3

PARTIES …………………………………………………………………………………4

NONPARTY ALTHEMEASE CORT/RAMSEY…………………………………………………5

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION …………………………………6

THE CRIMINAL TRIAL……………………………………………………………………**7**

THE APPELLATE PROCESS………………………………………………………...…11

KCDAO TURNS OVER BRADY MATERIAL ERIC RODRIGUEZ IS EXONERATED……12

**FIRST CAUSE OF ACTION PURSUANT TO 42 U.S.C. § 1983 AGAINST DEFENDANTS YATES, FERRARI AND SACCO**

14

**SECOND CAUSE OF ACTION** (*Monell//42* **U.S.C. § 1983: A G A I N S T  D E F E N D A N T  CUTY OF NEW YORK FOR ACTIONS OF THE NYPD**

16

**THIRD CAUSE OF ACTION** (*Monell/42 U.S.C. § 1983*) **CLAIM AGAINST DEFENDANT CITY OF NEW YORK FOR ACTIONS OF KCDAO) SYSTEMIC BRADY VIOLATIONS AND PROSECUTORIAL MISCONDUCT**

21

**FOURTH CAUSE OF ACTION** *MONELL* **AND 42 U.S.C. § 1983 AGAINST DEFENDANT CITY OF NEW YORK FOR ACTIONS OF THE KCDAO BECAUSE OF THE KCDAO CHINESE WALL POLICY REGARDING WITNESS PAYMENTS**

40

JURY DEMAND …………………………………………………………………… 47

DAMAGES DEMAND …………………………………………………………...… 48

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

WILLIAM ERIC RODRIGUEZ A/K/A
WILDON RODRIGUEZ,

                     Plaintiff,

      -against-

THE CITY OF NEW YORK, DETECTIVE
JOSEPH YATES, POLICE OFFICER DANIEL
SACCO, DETECTIVE JOHN FERRARI,
as employees of the New York City Police
Department and Individually,

                    Defendants.

----------------------------------------------------------x

**COMPLAINT**

Index No.: 21-cv-1924 (BMC)

**Jury Trial Demanded**

Plaintiff WILLIAM ERIC RODRIGUEZ ("Plaintiff"), by his attorneys, SUBIN ASSOCIATES, LLP and LAW OFFICES OF ADAM J. ROTH, complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.  This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and state law, seeking monetary damages for Plaintiff due to his wrongful arrest, prosecution, conviction, and twenty-one-year imprisonment caused by the pervasive misconduct of the Defendants.

2.  In 1999, Plaintiff was wrongfully convicted of murder and sentenced to twenty-five years to life. Plaintiff's conviction was obtained through the eyewitness testimony of a single witness, Althemease Cort. The State had no other evidence. Prior to her testimony in Plaintiff's case, Ms. Cort was also a witness for the prosecution in two other murder trials (*People v Carver* and *People v Charriez[1]*). She repeatedly received favorable treatment in criminal cases against her in

---

[1] Louis Charriez's conviction was recently overturned, the decision granting his 440 motion is attached as Exhibit K.

exchange for her testimony. Moreover, Ms. Cort received financial assistance from the Kings County District Attorney's Office (KCDAO) from 1997 to 1999. Ms. Cort also had an established connection with the detectives investigating Plaintiff.  She told defendant Sacco that she was defendant Yates CI.

3.    The Assistant District Attorney assigned to Plaintiff's case, Kyle Reeves, Esq. failed to disclose this exculpatory evidence in direct violation of his *Brady* obligation. Moreover, Reeves misled the court, the jury, defense council and the Plaintiff. At trial, Defendant Reeves repeatedly emphasized the fact that Ms. Cort had received nothing in return for her testimony against Plaintiff.

4.    After spending twenty-one years wrongfully incarcerated, Plaintiff's conviction was vacated on April 22, 2019, pursuant to CPL 440.10(b) and CPL 440.10(c) by Supreme Court Judge Guy J. Mangano, Jr. *See* Exh. A for a copy of this decision. The Appellate Division affirmed. *See* Exh. B for a copy of this decision. In their decisions, both courts emphasized the outright failure of the KCDAO to disclose exculpatory or impeachment evidence and ADA Reeves blatant misstatements to the jury.

5.    This lawsuit seeks to hold the defendant, CITY OF NEW YORK, liable for the above misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and *Monell v Dept. of Soc. Serv.*, 436 U.S. 658 (1978). The actions of the police detectives and prosecutors in this case resulted from affirmative or *de facto* municipal policies, practices and customs that violated the constitutional rights of criminal suspects and defendants, or from the deliberate indifference by policy-making officials, acting on behalf of the City of New York, to such violations. As Plaintiff will demonstrate, the NYPD and the KCDAO, as a matter of policy, coerced witnesses to give false or unreliable testimony through the misuse of their powers, concealed exculpatory

or impeachment evidence known as "*Brady*" material, and lied to or misled the courts, jurors, defense attorneys, and criminal defendants to cover up their misconduct.

6.   This misconduct has caused Plaintiff to suffer emotional distress, psychological injuries, physical pain and suffering, lost educational and professional opportunities, lost familial relationships, and loss of quality of life. Accordingly, Plaintiff is seeking damages in the amount of $50,000,000.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

7.   This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

8.   Jurisdiction is conferred on this Court by 28 U.S.C. §§§ 1331, 1343, and 1367.

9.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

10. Upon information and belief, shortly after his conviction was vacated by Judge Mangano pursuant to CPL 440.10, Plaintiff pro se filed a notice of claim against the City of New York. Thereafter, when the Appellate Division affirmed the CPL 440.10 decision, Plaintiff again filed a notice of claim, by counsel, on October 24, 2020. Thereafter his indictment, No. 4116/94, was dismissed, deeming the preceding notice of claims a nullity. The instant cause of action accrued when the indictment was formally dismissed on January 22, 2021.

11. On or about January 28, 2021, Plaintiff served upon Defendant City of New York timely notice of the present claims pursuant to New York General Municipal Law § 50-e.

12. On April 8, 2021, Plaintiff presented for an examination of claims pursuant to New York General Municipal Law § 50-h.

13. This action has been commenced within one year of the accrual of Plaintiff's cause of

action. Under CPLR 215(8), where a criminal action has been commenced arising out of the same conduct, the plaintiff shall have one year from the date of the termination of the criminal action (as defined by CPL 1.20) to bring the claim.

14. CPL 1.20(16)[c] states that a criminal action terminates with the imposition of sentence or some other final disposition in a criminal court of the last accusatory instrument filed in the case.  In the instant case, the case was terminated with the final disposition of the accusatory instrument by dismissal on January 22, 2021, see transcript from January 8, 2021 attached as Exh. C and Certificate of Disposition attached as Exh. D.

15. Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

## PARTIES

16. Plaintiff, WILLIAM ERIC RODRIGUEZ, is a citizen and resident of the State of New York and of the United States.

17. Defendant, CITY OF NEW YORK, of which the County of Kings is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

18. Defendant City of New York is a municipality that is  a  political subdivision  of  the State of New York, was the employer of the New York City Police Department ("NYPD") defendants Joseph Yates, Daniel Sacco and John Ferrari and  is  and  was  at  all times relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD") and the K i n g s  County District Attorneys Office ("KCDAO").

4

19. Defendant, DANIEL SACCO, at all relevant times, was a police officer employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinance, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

20. Defendant, JOHN FERRARI, at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinance, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

21. Defendant JOSEPH YATES at all relevant times, was a police officer employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinance, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

22. Defendant City of New York, vis a vis the KCDAO employed both Kyle Reeves and Peggy Hoffman who were assigned to try the case against the plaintiff.

23. Ann Bordely, Esq. was assigned the appeal and litigated throughout its appellate course and habeas petition.

24. Defendant City of New York, vis a vis the KCDAO employed assistant District Attorneys Michael Vecchione, Timothy Gough, Richard Safianow, Barry Schreiber, Robert Kaye, Larry Itzkowitz, and Amy Feinstein; who were all employees of the KCDAO from 1994-1999.

25. Defendant City of New York, vis a vis the KCDAO employed Edward Michael Wishner and was responsible for the witness relocation fund.

**<u>Non Party Althemease Cort</u>**

26. The KCDAO case rested solely on the testimony of Althemease Cort.

27. The day following Craig Jolly's murder, November 29, 1993, Ms. Cort was interviewed by detectives and told them she did not see or know anything about the murder.

28. Ms. Cort had previously acted as a witness for the KCDAO in another homicide case.

29. In February 1994, Ms. Cort had an outstanding bench warrant for possession of a controlled substance, 3rd a B felony, arising from a 1988 arrest.  In 1989, she pleaded guilty in exchange for a six month split sentence, but failed to return to Court.

30. In February 1994 she was then arrested in Manhattan on a new felony charge; Criminal possession of stolen property 4, a Class E felony.

31. While being held on her open warrant in February 1994, she then told Defendant Sacco that she was she was a confidential informant for Defendant Yates.

32. This conversation was reflected in a note from Defendant Sacco sent to Yates, saying "it was too late to void the arrest."

33. While she was in Rikers awaiting sentencing on the outstanding B Felony, she then remembered not only that it was the plaintiff who killed Craig Jolly, but even more that she witnessed it.

34. On February 10, 1994, Ms. Cort pleaded guilty to the possession of stolen property, a class E felony.

35. The judge advised Ms. Cort that she was a predicate offender and that she would receive a sentence of no less than 1 and ½ years and no more than 3 years for that crime.

36. Instead, thereafter, after her identification of the plaintiff in a line up she was sentenced on both the E felony and B felony.

37. Her sentence was six months split for both crimes.

38. From 1997-1999, Ms.Cort received over $35,000 in housing and spending checks from the KCDAO.

39. None of this information was turned over to the defense.

40. In fact, the KCDAO repeatedly, in both *Charriez* and *Rodriguez*, stressed that Ms. Cort had no reason to lie and no motive to fabricate, furthermore, that she had not received anything in exchange for her testimony.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

41. On November 28, 1993, Craig Jolly was shot and killed in Brooklyn, New York. Defendants, JOSEPH YATES and JOHN FERRARI, were the detectives assigned to investigate the shooting. Ms. Cort, a purported eyewitness to the shooting, did not come forward initially; in fact she denied knowing anything about the murder.

42. On January 14, 1994, Ms. Cort was arrested by Defendant, DANIEL SACCO, for shoplifting. She informed SACCO that she was a confidential informant for YATES. SACCO then informed YATES that he had arrested Ms. Cort. It was not until after Ms. Cort had been arrested that she disclosed to members of the NYPD and the KCDAO that she had seen the shooting of Craig Jolly and identified Plaintiff as the shooter.

43. When Ms. Cort was arrested on January 14, 1994, there was an outstanding bench warrant issued for her arrest. She informed a probation officer that she did not return to court because "an ADA assured her that he would 'take care of [her] case' if she testified in an unrelated homicide case." *See* Exh. E annexed hereto.

44. The outstanding bench warrant was for an E felony.  After agreeing to cooperate, Ms. Cort was illegally sentenced to a split six month sentence on the outstanding felony notwithstanding that the minimum allowable sentence was 1 and ½ years.

45. In 1994, Ms. Cort was allegedly a witness in a murder case, *People v. Stanley Carter.*

46. In 1997, Ms. Cort testified on behalf of the prosecution in another murder trial, *People v Charriez*,[2] where she was also purportedly an eyewitness.

47. Prior to the trial, Ms. Cort was moved into protective custody. Edward Wishner took over the custody of Ms. Cort on December 10, 1997.

48. At the trial of *Charriez*, Timothy Gough told the jury that Ms. Cort received nothing for her testimony.[i] Gough had personally procured Ms. Cort housing assistance and monetary benefits, so he knew this statement was false.

49. Timothy Gough was never reprimanded or censured for this blatant misrepresentation to the jury.

50. Instead, he was repeatedly promoted to higher positions within the KCDAO.

51. In fact, Mr. Gough is currently the chief of homicide at the KCDAO.

52. After the *Charriez* trial ended, Ms. Cort remained in housing paid for by the KCDAO until 1999.

53. From 1997 through 1999, the KCDAO paid for Ms. Cort's housing and provided her with thousands of dollars in allowances.  The checks totaled over $35,000 in payments.

54. Many of the checks written to Ms. Cort were personally signed by Michael Vecchione. Mr. Vecchione has a documented history of prosecutorial misconduct.  For ease of reference, plaintiff directs this Court to the plaintiff's Complaint in *Jabbar Collins v. New York City, et. Al.*, 11 cv 766 EDNY for a detailed list of Mr. Vecchione's indefensible conduct.  See also the Court's decision on the motion to dismiss, docket entry 91.

---

[2] Charriez's conviction was also recently overturned, where the KCDAO engaged in remarkably similar misconduct; see Exhibit K.

55. Nothwithstanding his repeated acts of impropriety, he continued to receive promotions from Charles Hynes and was never sanctioned; in fact, he was repeatedly promoted by Charles Hynes.

56.  During the time that Mr. Rodriguez was prosecuted, Kyle Reeves was supervised by Barry Schreiber.

57. Upon information and belief, Barry Schreiber never advised either Kyle Reeves or Peggy Hoffman that Ms. Cort was receiving benefits.

58. .  The KCDAO created a wall between the prosecutors and the housing assistance and witness assistance fund, so that the trial attorneys would represent that the cooperating witnesses had received nothing in exchange for their cooperation.

59. This callous and deliberate indifference to the constitutional rights of the accused was a de facto policy of Charles Hynes' KCDAO.

## **The Criminal Trial**

60. Plaintiff was arrested for the murder of Craig Jolly on November 5, 1998. Shortly thereafter, Plaintiff's then attorney, Paul Madden, Esq., filed a motion demanding exculpatory or impeachment materials. Kyle Reeves, on behalf of the KCDAO, replied by stating that there was no exculpatory evidence known to the prosecution at that time.

61. The case was tried twice.  The first trial ended in a mistrial due to juror illness.  The second trial commenced on October 14, 1999.

62. During his opening statement at trial on October 14, 1999, REEVES emphasized to the jury that Ms. Cort had received nothing in return for her testimony. *See* Exh. F annexed hereto for a copy of the transcript dated October 14, 1999, p. 15. He stated, "[n]o one gave her any deals. No one gave her any breaks." *See* Exh. F, p. 15.

63. Moreover, REEVES questioned Ms. Cort directly on this subject for the benefit of the jury and she denied receiving any deals or having any contact with the KCDAO "for a long period of time". *See* Exh. F, p. 51-53.

64. In his summation, REEVES again pointed out to the jury that Ms. Cort testified without receiving anything in return. *See* Exh. F, p. 477-478. He told the jury that "she's got no motive to lie." *See* Exh. F, p. 486.

65. This, as KCDAO well knew, was false.  Ms. Cort had received over $35,000 of financial benefits from the KCDAO and also received favorable treatment (1) on an outstanding felony warrant issued by the Kings County Court in 1989 and (2) a pending felony in Manhattan Criminal Court.

66. Furthermore, the KCDAO did not turn over a note in its possession where Cort admitted to being a confidential informant for the detective investigating the murder until 2018.

67. KCDAO had a policy and procedure in place to refuse to provide exculpatory evidence and *Brady/Giglio* material to defendants.

68. As a result of the KCDAO policies and procedures, several convictions were tainted and ultimately overturned.

69. The assistant district attorneys who failed to provide *Brady/Giglio* material were never reprimanded by Charles Hynes or anyone at the KCDAO.

70. In fact, those individuals who failed to provide such material were often promoted and lauded by Charles Hynes as exemplary prosecutors.

71. On November 5, 1999, Plaintiff was wrongfully convicted of Murder in the Second Degree and sentenced to twenty-five years to life for shooting Craig Jolly. Plaintiff was only twenty-four years old at the time of his conviction.

72. At his sentencing, Mr. Rodriguez again professed his innocence.

73. During the next twenty one years, the plaintiff filed numerous appeals where the defendants denied that Ms. Cort had motive to lie.

## The Appellate History

74. In October of 2000, the plaintiff filed his first appeal alleging, in part that Ms. Cort's story was not believable and did not withstand any real scrutiny.

75. In the Respondent's brief, the KCDAO again stated "No deals or promises were made in exchange for her [Cort's] testimony." (pg. 24 of respondent's brief attached hereto as Exhibit L).

76. In Respondent's supplemental brief, the KCDAO stated "Cort had no motive to lie about defendant's guilt of his crime." (pg. 9 of respondent's brief attached hereto as Exhibit M).

77. In April of 2001 the plaintiff filed his first 440.10 motion.

78. The People's brief stressed Judge Lott's statement to defense counsel "you did everything you could to shake Ms. Martin [Cort's] testimony and it took the jurors less than two hours to come back with a guilty verdict."  Again, the KCDAO office never disclosed that it had paid Ms. Cort over $35,000.

79. The Court denied the 440.10 motion by decision dated March 22, 2002.

80. On November 26, 2003, plaintiff *pro se*, filed an habeas petition stressing that Ms. Cort's testimony was unreliable.

81. The KCDAO opposed the Habeas petition again stressing that "no deals or promises were made in exchange for Cort's testimony" (pg. 13 of respondent's opposition to plaintiff's habeas petition annexed as Exhibit N).

82. By Order of Judge Amon, the Habeas Petition was denied on May 17, 2007.

83. Plaintiff moved for an in camera inspection and/or disclosure to the Pre-sentence investigation report of Althemease Cort on October 11, 2013.

84. In its opposition to production of the pre-sentence report, the assistant General Counsel for the Department for Probation stated "whether or not Ms. Cort-Martin was given a deal was an issue of credibility for the trier of fact to determine at trial," and refused to provide the report.

85. The motion was denied by Order of Judge Parker on January 14, 2013 explicitly stating "whether Cort-Martin had a cooperation agreement was a credibility issue for the trier of fact."

86. Plaintiff's application for leave to appeal was denied by the Second Department on May 14, 2014.

### KCDAO Provides Brady Material And Eric Rodriguez is Exonerated

87. Charles Hynes was voted out of office by the people of Kings County.

88. Thereafter, in response to a FOIL request, after 16 years of denying such information existed, the KCDAO turned over copies of the checks written by the KCDAO office to Althemease Cort for over $35,000.

89. Mr. Rodriguez then made another 440.10 motion returnable on December 29, 2015.

90. Counsel was assigned and the parties submitted supplemental briefs.

91. After a new judge was assigned to the case, Judge Mangano, by Order dated April 22, 2019, granted plaintiff's 440.10 motion and vacated plaintiff's conviction.

92. The KCDAO appealed the decision, and the Second Department affirmed Judge Mangano's decision on June 19, 2020.

93. The KCDAO then postured as though the case would be retried.

94. However, on January 8, 2021, plaintiff's moved for a dismissal of the action and the KCDAO consented.

95. All charges were dismissed.

96. Plaintiff sat for a 50-H hearing on or about April 8, 2021.

97. All predicates to bring an action against the City of New York have been met, and the claim is ripe for adjudication.

98. Plaintiff spent twenty-one years wrongfully imprisoned. During that time, he spent over two years in solitary confinement and over two years in keep lock

99. Plaintiff's injuries and damages include, but are not limited to:

    a. His malicious prosecution and conviction for murder and sentence of 25 years to life in prison;

    b. His false arrest and imprisonment resulting in his loss of liberty for a total of twenty-one years, including over two years in solitary confinement and over two years in lock keep;

    c. Past and future physical illnesses and injuries resulting from his wrongful conviction and his time in prison;

    d. Past and future mental and emotional injuries and suffering;

    e. The loss of the services, society, companionship, and consortium of his family and friends;

    f. The loss of educational and professional opportunities;

    g. The loss of quality of life;

    h. The loss of employment income; and

    i. Legal fees and expenses.

## FIRST CAUSE OF ACTION PURSUANT TO 42 U.S.C. § 1983
## AGAINST DEFENDANTS YATES, FERRARI AND SACCO

100.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 46 of this Complaint.

101.     Defendant YATES, acting in concert with and in aid of Defendants FERRARI and SACCO, knowingly and willfully coerced Ms. Cort to make a knowingly false statement against Plaintiff in exchange for leniency in her criminal cases.

102.     Defendant YATES failed to disclose that Cort was his personal confidential informant.

103.     Defendants knew that the statement would, and caused the statement to, be relied upon by the KCDAO and the court as a basis to arrest Plaintiff, to formally initiate his prosecution, to hold him for trial without bail, and to compel Ms. Cort to give testimony consistent with her statement at the trial itself.

104.     Defendant YATES knew that had he disclosed that Cort was his CI, it would have been highly probable that Mr. Rodriguez would not be arrested for the murder of Craig Jolly.

105.     By virtue of the foregoing, Defendants, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Plaintiff for which they knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Plaintiff to be deprived of his liberty.

106.     Such criminal proceedings were ultimately terminated in Plaintiff's favor.

107.     The aforesaid conduct, which Defendants committed in concert with and in aid of each other, and/or in concert or conspiracy with others named and unnamed, operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

a. Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable evidence, including the statements and testimony of a witness who had been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution;

b. Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

c. To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v Maryland*, 373 U.S. 83 (1963), *Giglio v United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

108.    The foregoing violations of Plaintiff's federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

109.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendants' employment and authority.

110.     Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

111.     By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

### SECOND CAUSE OF ACTION (*Monell//42 U.S.C. § 1983: A G A I N S T DEFENDANT CITY OF NEW YORK FOR ACTIONS OF THE NYPD*)

112.      Plaintiff repeats and realleges each and every allegation contained in ,¶¶ 1 through 99 as if fully set forth herein.

113.     The City of New York, vis a vis, the KCDAO failed to disclose (1) that Cort received favorable treatment on two outstanding felonies in exchange for her testimony, and (2) that Cort was defendant YATES confidential informant.

114.     The defendants SACCO, YATES and FERRARI coerced a false identification at a line-up in exchange for leniency on her two outstanding felonies because she was YATES CI. See Exhibit d.

115.      Had these two facts been disclosed rather than hidden, the result of the case undoubtedly would have been different.  As Judge Lott stressed, Rodriguez's counsel through "everything he had to shake her testimony."

116.     However, due to the policies of Charles Hynes and the KCDAO, the defendant was not provided with everything he was entitled to under *Giglio* and *Brady*.

117.     The foregoing violations of Plaintiffs federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the

constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

118.    Prior to Plaintiffs arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, tothe risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

      a.    The use of excessive promises of rewards and unduly coercive interrogationtechniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

      b.    The determination of probable cause to make an arrest; and

      c.    The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information ("*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

119.    With respect to "a" and "c" in the preceding paragraph, prior to Plaintiff's  arrestand the initiation of his prosecution in 1994, the NYPD provided no training at all.[12]

120.    The aforesaid deliberate or *de facto* policies, procedures, regulations,

practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

a) to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation andprosecution of criminal cases;

b) that such issues either present police employees with difficult choicesof the sort that instruction, training and/or supervision will make less
difficult or that the need for further instruction, training, supervision and/ordiscipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to makethe wrong choice; and

c) that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminalsuspects or defendants and cause them constitutional injury.

121. The aforementioned policymaking officials had the knowledge and the noticealleged in the preceding paragraph based upon, among other circumstances:

a) credible allegations, many substantiated by judicial decisions finding, that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony *(see* Exh. F appended hereto and incorporated herein by reference, listing some of those decisions);

b) civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld materialevidence, or conducted

18

searches or arrests without probable cause *(see* Exh. G appended hereto and incorporated herein by reference, listing some of those lawsuits);

c)     numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

d)     judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison,* 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady, see Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra;*

e)     formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

f)     the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

122.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of

criminal prosecutions, and the disclosure of *Brady* material.

123.     Deposition testimony from present and former police detectives,

including supervisors, during several civil rights lawsuits, including *Zahrey v. City of New York, et al.,* 98 Civ. 4546 (DLP) (S.D.N.Y.), establishing, prior to and during the time period of Plaintiffs arrest and prosecution, the NYPD provided no training concerning appropriate interrogation of accomplice or informant witnesses and *Brady* compliance. Most such witnesses had no idea what *"Brady"* was and  no clue about their obligation to comply with it.

124.     The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

125.     During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

126.     The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual

Police Defendants of Plaintiffs rights under the Constitution and laws of the

United States.

127.     By virtue of the foregoing, Defendant City of New York is liable

for having substantially caused the foregoing violations of Plaintiffs constitutional

rights and his constitutional injuries.

**THIRD CAUSE OF ACTION** *(Monell/42 U.S.C. § 1983)* **CLAIM AGAINST DEFENDANT CITY OF NEW YORK FOR ACTIONS OF KCDAO) SYSTEMIC BRADY VIOLATIONS AND PROSECUTORIAL MISCONDUCT**

128.     Plaintiff repeats and realleges each and every allegation contained

in ¶¶ 1 through 110 as if fully set forth herein.

129.     At the time of Plaintiffs original prosecution, and continuing until

the Court's dismissal of Plaintiffs case and his release from prison, District

Attorney Charles J. Hynes, as the manager and chief administrator of the

KCDAO, a City agency, maintained a policy, custom and/or practice of deliberate

indifference to violations by his employees of the constitutional rights of

individuals who were investigated and criminally prosecuted in Kings County,

including, but not limited to, abuse of process, manufacturing of false evidence

and testimony through improper coercion of witnesses, *Brady* violations, reliance

on false or misleading evidence and argument at trial ("the policy"), and covering

up the same.

130.     This policy began with his induction as District Attorney in 1990

and continued until his exit from the office.

131.     The policy permits, encourages, or acquiesces in the commission of,

constitutional violations of the rights of suspects and defendants by prosecutors, detective-investigators, and NYPD detectives working with the D.A.'s Office, particularly in high profile or serious cases where arrest and conviction is most desired by the Office. The policy led directly to the violations of Plaintiffs constitutional rights before and during his trial, his wrongful conviction, and the subsequent cover-up of police and prosecutors' wrongdoing, which greatly prolonged Plaintiffs wrongful imprisonment and other damages.

132.    More specifically, it was the policy of Hynes to directly encourage, or be indifferent to and thereby indirectly encourage, prosecutors, detective-investigators, and NYPD detectives working with them to abuse lawful process to gain custody of vulnerable witnesses in order to coerce them into giving inherently unreliable or false testimony favorable to the prosecution.  The above law enforcement officials would use the following illegal tactics to coerce witnesses:

> a)    Issuing unauthorized and unlawful "office" subpoenas to compel witnesses to attend interviews at their office, despite numerous judicial decisions making clear that such process was unlawful;
>
> b)    Lying to courts about their need and entitlement for material witness warrants, thereby obtaining authorization to bring purportedly recalcitrant witnesses directly to court for appointment of counsel and a judicial hearing, only to then kidnap the witnesses and hold them either in their Office or in a hotel room, where they would threaten, intimidate, or cajole them into "cooperating" and remaining in their custody until completing their testimony at trial;
>
> c)    Misleading courts to issue orders allowing them to take custody of incarcerated witnesses and interview them at the D.A.'s office

in the presence of the witnesses' counsel, only to then interrogate such witnesses without notifying their counsel;

d)   Causing the New York State Division of Parole and the State Department of Corrections to illegally revoke the release of prisoners[13] so that prosecutors could gain custody of them and threaten them with indefinite imprisonment unless they "cooperated" by testifying favorably for the prosecution; and

e)   Coercing witnesses who have been arrested on unrelated charges to "cooperate" by exploiting their drug withdrawal and dependency, holding them prisoner in remote locations while threatening to interrogate them indefinitely, and threatening harsh prosecution and imprisonment while simultaneously holding out a carrot stick of leniency and monetary reward.

133.   It was Hynes's policy as well to tolerate (and thereby encourage) violations of his Office's constitutional obligation to make timely disclosure to the defense of exculpatory or impeachment information know as *Brady* material.  His deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Plaintiff's case.

134.   *See* Monique Ferrell Affirmation in Opposition to Jabar Collins'CPL§ 440.10 Motion, dated Nov. 3, 2006,, 41 (Office's "usual practice" is to notify the Division of Parole that a parolee or inmate on work release is not cooperating so that it will take him into custody and make him "available," terming this an"[e]ntirely routine practice"); Ferrell, Supplemental Affirmation dated Nov. 9, 2006,, 12 ("practice of this Office" to notify a supervising agencywhen a parolee "misses appointments and refuses to cooperate").

135.   It was Hynes' policy to continue to deny that *Brady/Giglo* material existed.

23

136.    It was Hynes' policy to hide benefits given to witnesses from trial attorneys, and have those assistant district attorneys' misrepresent to the jury that "the witness had no reason to lie."

137.    It was Hynes' policy to have the appellate attorneys emphasize that the witnesses credibility had no reason to be questioned.

138.    In this regard, prosecutors and investigators were permitted and/or encouraged to refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the Office's "riding" policy, prosecutors were permitted and even encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect's or defendant's guilt.

139.    Hynes's prosecutors were permitted and/or encouraged to withhold recantation evidence, as well as statements and evidence, including 911 tapes, tending to prove a defendant's innocence, unless they "believed" such evidence, thus depriving the defense and the jury of vital information, required to be disclosed under *Brady*, that was necessary to evaluate witnesses' credibility and defendants' guilt or innocence.

140.    Prosecutors, in violation of *Brady*, were permitted and/or encouraged to refrain from disclosing material witness applications, orders, and

proceedings, relocation assistance promised or provided to witnesses, and other pressure tactics, promises, or rewards used to influence witnesses.

141.    Prosecutors were permitted and/or encouraged not to comply with the Office's ongoing *Brady* obligations after trial, to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, or through FOIL requests, and to even lie to or mislead courts in affidavits and testimony, all in order to cover up the original misconduct and defeat defendant's efforts to expose misconduct and overturn wrongful convictions.

142.    While prosecutors were told in theory to comply with their *Brady* obligations, they were not told there would be any negative consequence to them if they failed to, and in fact there was none.

143.    Hynes had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them.

144.    Despite dozens of court decisions, 56 of which are listed in Ex. H, finding that prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady, Rosario,* or statutorily-mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, none of the prosecutors involved were disciplined.[14] They were not fired or suspended, fined, or demoted. Notations were not placed in their personnel files. They were not reported to outside disciplinary bodies. To the contrary, in opposing defendants' efforts to

25

overturn their convictions in such cases, Hynes almost always defended the propriety of his assistants' behavior, thereby ratifying it or at least signaling his tolerance of it- just as he did in Plaintiff's case- and such personnel continued to receive raises, bonuses, and promotions.

145.    Ex. H contains cases either explicitly finding constitutional violations or finding violations under State law of *Rosario* or discovery violations that amounted to *Brady* violations.In the State law decisions, the appellate court did not need to reach the *Brady* issue, but the violations were constitutional in nature nonetheless.

146.    During depositions in *Zahrey  v.  City of New  York,  et al.,* 98 Civ. 4546 (OLP) (S.D.N.Y.), the former Chief of Investigations for Hynes, Dennis Hawkins, and Hynes's Counsel

147.    A number of cases handled by Hynes's office during the time period of Plaintiff's prosecution evidence the above polices and patterns of misconduct by Hynes's staff and Hynes'sapproval or toleration of such behavior.

148. Early in his tenure, Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 152 (1992). The case was built on the testimony of two teenage girls who, before trial, recanted their statements to police and to the grand jury. When one of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and

then, in the midst of being challenged by the prosecutor, invoked her Fifth Amendment right against self-incrimination, the following astounding events occurred, according to the New York Court of Appeals' opinion:

149. [T]he prosecution interrupted Lawrence's midafternoon testimony and obtained a continuance. Lawrence, then 17 years old, was (1) arrested; (2) charged with perjury; (3) taken in handcuffs crying and frightened to the District Attorney's office; (4) interrogated and threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until 5:00 A.M. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 A.M. where she was kept in handcuffs except for her time on the stand. Lawrence's postarrest and postincarceration testimony, tending to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody. (79 N.Y.2d at 177).

150. Dino Ameruso, counsel to Charles Hynes, acknowledged that there was no formal disciplinary procedures or policies, and they were unaware of any ADA having ever been disciplined during Hynes's tenure for misconduct committed during the investigation or prosecution of criminal allegations. Further, the City Law Department acknowledged, with respect to a list of court decisions involving *Brady* and related violations, that no discipline had been imposed on any of the prosecutors. Hawkins admitted the Office had no written policy for disclosing *Brady* material. Hawkins and ADA Theresa Corrigan, who also gave

a deposition, admitted that they were unaware of any specific training the Office provided on how to question or evaluate informant or accomplice witnesses. Finally, Hawkins testified that, despite having virtually dailycontact with Hynes over many years, he had not once ever heard him discuss the training of ADAs in such areas. Although the defendants in the *Zahrey* lawsuit did not admit liability, judgment was entered against Corrigan and Charles Guria, the chief of Hynes's Civil Rights Bureau who reported to Vecchione, individually (and against the City of New York and three former detective-sergeants), in 2009, for $750,001, plus counsel fees, pursuant to F. R. Civ. P. 68, to resolve Zahrey's lawsuit alleging malicious prosecution and manufacturing of false testimony during 1994-95, but Hynes's conducted no investigation and imposed no discipline on Guria or any other prosecutor for their conduct of the matter.

151.    In reversing the conviction,[16] the Court condemned the "egregious" behavior of the KCDAO in "'legally' coerce[ing Lawrence's] testimony." *Id.* (citing *Rochin v. California,* 342 U.S.165, 172 (1952) (conduct that "shocks the conscience").

152.    That the jury heard what had occurred and could judge the witness's credibility was "not adequate," the Court's emphasized. "Experience has taught that such reliance offers only chilly comfort to prejudiced defendants, no less than to innocent victimized witnesses, and to maintenance of the integrity of the criminal justice process." *Id.*

28

153.    Shortly after the *Russ* decision, prosecutors under Hynes showed that they would take their lead from Hynes, not the Court of Appeals.

154.    In *People v. Ruddy Quezada,* police detectives working with the KCDAO secretly arrested the prosecution's principal witness, Sixto Salcedo, on a material witness order the KCDAO had obtained. Instead of taking him to court, they kidnaped him, and held him with his wife incommunicado at the Marriott Hotel at LaGuardia Airport, where they threatened him with prison unless he conformed his trial testimony to his grand jury testimony. Neither the material witness order, the detention at the hotel, nor the other coercive threats to this witness was disclosed to the defendants, who were convicted.

155.    The Court reversed the conviction on the ground that the prosecution had violated thedefendant's rights by misusing the two recanting witnesses' hearsay grand jury testimony as thebasis for the jury to convict.

156.    Years later, Salcedo recanted his trial testimony, and other witnesses emerged showing that the defendant, contrary to the People's case, had not committed the shooting. When Quezada, in 2003, moved in State court to vacate his conviction, the trial prosecutor, who was stillin the office, ADA Ephraim Shaban, presented the sworn testimony of the detective, Thomas Buda, to deny that any material witness order had been obtained, that Salcedo had been arrested, or that he had been held at a hotel, and argued that Salcedo's "false" allegations of coercion undermined the credibility of his recantation. *See People v. Quezada,* 16 Misc.3d 1113(A) (Sup. Ct., Kings Co. 2007) (Gerges, J.). The People were successful. The court denied the

defendant's motion, leave to appeal was denied, and it appeared he would never be able to challenge his conviction, since he already had lost a federal habeas corpus petition and by law had the right to bring just one.

157.   However, in a highly unusual decision, the United States Court of Appeals directed that the Federal District Court permit Quezada to pursue his second habeas petition. *See Quezada v. Smith*, 624 F.3d 514 (2d Cir. 2010).

158.   Just as in Plaintiff Rodriguez's case, Quezada's attorneys sought discovery, and the KCDAO then had no choice but to reveal the truth that it had been falsely denying, through knowing reliance on perjury, for seven years: there *was* a material witness application and warrant, and there *were* records showing that Salcedo had been held at the Marriott Hotel at LaGuardia Airport.

159.   Shortly after the trial in the *Quezada* case, the same judge who had presided, Justice Abraham G. Gerges, denounced the practice of the KCDAO to misuse the court's subpoena process to coerce witnesses. In a decision published July 7, 1994, Justice Gerges, in still another murder case being prosecuted by Vecchione's bureau, condemned a homicide ADA for serving a subpoena on a witness on a day there would be no testimony "in the hope that it would coerce the witness into consenting to be interviewed prior to testifying," found this to be "unprofessional conduct" under numerous prior court decisions outlawing the practice, and admonished the KCDAO that the "practice should not be replicated." *People v. Neptune*, 161 Misc.2d 781,785,615 N.Y.S.2d 265,267 (Sup. Ct., Kings Co. July 7, 1994) (emphasis added) (quoting *People v. Natal,* 75 N.Y.2d 379,385

(1990)).

160.    Immediately thereafter, in another murder case prosecuted by Hynes's bureau, *People v. Brian Bond,* Ind. No. 13991/91, the assigned ADA defied  Justice Gerges and  the decisions of the Court of Appeals and the Appellate Division upon which his decision had been based. ADA Stan Irvin and detective-investigators working under his direction illegally subpoenaed all prospective witnesses to their Office to coerce them to submit to office interviewsbefore testifying at the trial. Without disclosing to the court the impropriety of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any witness who failed to comply with the subpoenas.

161.    One witness, a crack addict named Carmen Green, had told police detectives anddetective-investigators that she had not seen the incident in question at all. When KCDAO detective-investigators found her, they noted that she was too "impaired" to comply with the subpoena. They knew as well that she was under investigation for, and feared, that she and her children would be arrested for dealing drugs out of her apartment.

162.    Obtaining a material witness warrant authorizing Green to be taken "forthwith" to court, where an attorney would be appointed for her, Irvin instead had her brought to his Office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours. Only after she agreed to remain in their custody "voluntarily" did they finally bring her to court, after midnight, so that a judge could sign an order ratifying her "consent" to be detained until the conclusion of her

testimony.

163.    The prosecutor, ADA Irvin, then violated the KCDAO's *Brady*
obligations by not disclosing to the defense Green's prior statements denying having
seen the shooting, her eight- hour unlawful interrogation, her "impairment" on drugs,
the threats to arrest her and her family, and promises to relocate her at public
expense. Nor did he disclose the statements of her other family members that she
was not present during the shooting, or that they, too, had been promised, and did
receive, relocation assistance. Bond was convicted, in December, 1994, of murder.

164.    During an evidentiary hearing held in 1998 concerning Bond's
subsequent motion to vacate his conviction due to *Brady* and related constitutional
violations, an unapologetic ADA Irvin testified that it was the Office's *regular*
*practice* to pick up witnesses on material witness warrants and, instead of bringing
them directly to court "forthwith" as such warrants direct, to forcibly take them for
interrogation to the D.A.'s Office.

165.    In 2000, the New York Court of Appeals vacated Bond's conviction
due to the Office's failure to disclose Green's statements denying having seen the
homicide. The Office's Appeals Bureau had argued, on behalf of District Attorney
Hynes, that it had no obligation to disclose statements that, in its view, were
"untrue."

166.    In August and September, 1994, during the KCDAO's investigation of
an NYPD detective, Zaher Zahrey, on corruption allegations, detectives working
under the supervision of ADA Charles Guria obtained court orders to produce a

prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with Guria's approval, interrogated him without notifying his attorney.

167.    In March, 1995, after Quick had been sent upstate to serve his sentence, detectives, with Guria's approval, again met with Quick without his attorney, and, through a combination of coercion and excessive promises of speedy release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false. They tape recorded this meeting and gave the tape to Guria, who listened to it, heard the coercion and improper promises, and heard the encouragement of Quick to adopt a false story. Remarkably, rather than condemn the detectives' tactics, he told them that Quick's statements were "promising."

168.    In or about January, 1996, detectives working directly under Guria's supervision arrested several other individuals in the hope of turning them into State's witnesses, took them to remote locations instead of to court, and illegally interrogated them in violation of their right to counsel and to prompt arraignment.

169.    Because none of Quick's false story could be corroborated, which is a prerequisite for prosecution under New York, but not federal, law, Guria and his colleagues obtained Hynes's approval to recommend the case to federal authorities for prosecution. However, in doing so, they did not disclose the tape, the improper interrogation tactics used with Quick, or numerous of Quick's prior inconsistent statements.[17] When Quick inadvertently disclosed to the federal prosecutor that he

33

had been taped, Brooklyn ADAs delayed disclosing the tape for several weeks to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case. Zahrey ultimately was acquitted, but not until he had spent nearly nine months in pretrial confinement.

170.    One of the prosecutors, ADA Theresa  Corrigan, testified  at a deposition that, pursuant to her training at the Office, she did not believe she was under any obligation to disclose to the defense prior inconsistent statements or "recantations" if she did not find such statements to be credible or true. This was the position that the Office took in the Brian Bond appeal. She also testified to her training not to make any record of witness statements to avoid disclosure under *Rosario.*

171.    Also in 1994, Hynes ratified the misconduct of his Office in the Sarni Leka murder prosecution. Leka was convicted, in March, 1990, early in Hynes's tenure as District Attorney, of murdering a relative on a Brooklyn street. Shortly after the conviction, Leka moved to vacate his conviction because the prosecution had actively suppressed from the defense its knowledge that an off-duty police officer's observation of the shooting from his apartment window was flatly inconsistent with the People's proof at trial, which consisted of the highly questionable identification testimony of two traumatized passersby, and had suppressed two other witnesses' potentially exculpatory statements.  Not only did Hynes's office vigorously oppose the defendant's motion and appeal; *Hynes* wrote Leka's new defense counsel that he had "*personally* reviewed the facts and circumstances" of the case and "Mr. Leka's due process rights as a defendant were

34

*amply and ably protected"* (emphasis added). However, in 2001, the United States Court of Appeals vacated Leka's conviction, finding that the KCDAO had actively "suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). With the only two identification witnesses having recanted their testimony, the KCDAO was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison. In 2008, the City of New York settled Leka's *Monell* lawsuit based upon the KCDAO's *Brady* violations for $3.1 million.

172. Hynes had been on notice over the years, beginning before Plaintiff's trial, of credible allegations of overzealousness and misconduct directed specifically at Vecchione, but had consistently encouraged misconduct by KCDAO, just as he had encouraged the rest of his staff, by his indifference to such allegations.

173. In February 1995, which was prior to Plaintiff's trial, defendant Frank Rodriguez, who had been convicted at trial in October 1993 (*People v. Rodriguez*, Ind. No. 9893/92), documented in his appellate brief that KCDAO had blatantly violated numerous fundamental rules of trial behavior. The brief showed that KCDAO repeatedly and sarcastically asked the defendant on cross-examination whether the other witnesses in the case were lying - despite numerous appellate decisions decrying such a tactic. In summation, the brief

showed, KCDAO had improperly ridiculed the defense as "laughable,"

improperly argued that the defendant wanted the jury to believe only he was

telling the truth while all the People's witnesses were lying, and impermissibly

vouched for the People's witnesses as not "the type" of people who would lie.

174.   In early 1995, also before Plaintiff's trial, Hynes's office opposed

the motions of defense lawyers in *People v. Steven Ruiz, et al.,* Ind. No.

12848/94, which exposed KCDAO's improper practice of using "office"

subpoenas to compel witnesses, including the defendant, to appear at his Office

for interviews without counsel. Supreme Court Justice Robert Kreindler found

that the Homicide Bureau (led by KCDAO) had utilized such "office" subpoenas

"unethically and abused court process," and that they had "improperly denied

[the defendant's] request for an adjournment of the subpoena in order to obtain

counsel." KCDAO's conduct was particularly egregious because it came after

Justice Gerges's decision directing the KCDAO to no longer misuse subpoenas in

this fashion.

175.   KCDAO's misconduct reached new heights (and was eerily similar

to his misconduct in Plaintiff's case), and was fully exposed to Hynes, in the

Office's triple murder prosecution of Jeffrey Marshall. During the first trial in

March, 1993, KCDAO represented, and had his key rebuttal witness, Cicero

Murphy, testify, that Murphy was a "volunteer" witness, that KCDAO had made

no promises to Murphy, and that Murphy expected no benefit in return for his

testimony. Murphy testified that he had only weapon possession and assault

cases open, and that there was no relationship between these open cases and his testimony. Marshall was convicted of robbery and received a sentence of 12 ½ to 25 years in prison.

176.   KCDAO's homicide bureau then brought Marshall to trial in two additional murder cases. The ADA whom KCDAO assigned to handle these two cases, and who was working under his supervision, did not disclose any cooperation agreement between the Office and Murphy, and Murphy testified in 1994 that there wasn't any. (In both cases, Marshall was acquitted.)

177.   Shortly thereafter, the Nassau County District Attorney's Office prosecuted Marshall in an attempted murder case, and wrote the KCDAO to find out whether the Office had any cooperation agreement with Murphy. KCDAO personally responded, by letter dated January 17, 1995, *unequivocally denying* that his Office had any such agreement. Despite Murphy's testimony, Marshall was acquitted.

178.   Following Marshall's robbery conviction, on January 12, 1996, Marshall, represented by new counsel, moved, pursuant to Criminal Procedure Law § 440.10, to vacate his conviction. New counsel's investigation had revealed that KCDAO, after the first trial, had written to the State Division of Parole on Murphy's behalf to assist Murphy in obtaining an early release, and four days later had *personally* entered into a *formal written cooperation agreement* with Murphy to testify in the next two cases. The agreement allowed Murphy to receive a mere two-year sentence in satisfaction not only of his gun charge but

also of his pending *first degree rape* charge, for which he faced up to 25 years in prison- a charge that KCDAO had not disclosed to the defense at Marshall's first trial.

179.    Murphy's motion also included KCDAO's letter to the Nassau County D.A. *denying* the existence of the formal written cooperation agreement that *KCDAO* had signed.

180.    To defeat Marshall's motion, KCDAO then signed a sworn affirmation (also eerily similar to the false affirmation he executed to oppose Jabar Collins 440 motion), containing thefollowing false assertions of "fact":  that KCDAO had never discussed any benefit with Murphy before his initial testimony; that KCDAO did not even know at the first trial that Murphy was facing a rape charge; that KCDAO did not know that his subordinate had not disclosed the written cooperation agreement before the second and third trials, and that KCDAO somehow had misunderstood the Nassau County D.A.'s inquiry when KCDAO represented that "There are no agreements between this Office and Cicero Murphy..." Based upon KCDAO's affirmation (as in Plaintiff's case), a state judge denied thedefendant's 440 motion without a hearing.

181.    Hynes then rewarded Vecchione with a promotion to First Deputy District Attorney.

182.    Neither Vecchione, nor any other ADA, was disciplined in any respect for the misconduct - remarkably similar to Plaintiff's case - that occurred in the Marshall case.

38

183.    In March 2000, Judge Alan Marrus dismissed an indictment of a businessman, Sam Lustigmann, in an obstruction of justice case, because KCDAO had caused a grand jury to indict him despite having given him immunity from prosecution in exchange for his cooperation during an office interview.  While KCDAO claimed that his agreement with Lustigmann was voided by the latter's withholding of material information, the court rejected this defense because of KCDAO's failure to record or take any notes during the interview.

184.    For the sake of brevity, the plaintiff respectfully refers to the substantiated allegations contained in *Jabbar Collins v. City of New York*, 11-cv-766 EDNY as to additional misconduct by the KCDAO.

185.    In short, Charles Hynes encouraged, aided and rewarded the systematic deprivation of defendants' constitutional rights in order to secure convictions against innocent defendants.

186.    In the instant case, Vecchione signed multiple checks issued to Altheamease Cort but none of this material was provided to the defense.

187.    The note sent by Defendant Sacco to Defendant Yates was not provided by the KCDAO to the defense.

188.    Nonparty Cort was given an illegal sentence on 2 felonies and let off on many lesser crimes because of her cooperation.

189.    However, with zeal, the KCDAO denied that Ms. Cort had any reason t lie or fabricate evidence **for over 15 years.**

190.    The pattern of conduct rewarded and lauded by Hynes

191.    As a direct result of these policies, the plaintiff Eric Rodriguez was wrongfully convicted of murder and spent over 20 years in State Prison.

192.    The KCDAO office denied the existence of Brady material for over 15 years and it was not until Charles Hynes was voted out of office that the truth came to light.

193.    The KCDAO under Hynes systematically deprived defendants of *Brady/Giglio* material and violated the following Constitutional guarantees

    a.  Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable evidence, including the statements and testimony of a witness who had been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution;

    b.  Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

    c.  To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v Maryland*, 373 U.S. 83 (1963), *Giglio v United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

194.    The foregoing violations of Plaintiff's federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's

malicious prosecution without probable cause, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, the defeat and delay of his efforts to overturn his wrongful conviction, and his other injuries and damages.

195.     The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendants' employment and authority.

196.     Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

197.     By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**FOURTH CAUSE OF ACTION *MONELL* AND 42 U.S.C. § 1983 AGAINST DEFENDANT CITY OF NEW YORK FOR ACTIONS OF THE KCDAO BECAUSE OF THE KCDAO CHINESE WALL POLICY REGARDING WITNESS PAYMENTS**

198.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 192 of this Complaint.

199.     "A municipality's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution. Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Collins v. City of NY*, 923 F. Supp. 2d 462, 476 (EDNY 2013) (internal citations omitted). "Deliberate indifference may be inferred if the complaints of wrongdoing are followed by no meaningful attempt on the part of the municipality to investigate

or to forestall further incidents." *Id.* quoting *Vann v. City of NY*, 72 F.3d 1040, 1049 (2d Cir. 1995).

200.     The City of New York, via *Monell*, may be held liable for prosecutors (1) failing to disclose *Brady* material (including failure to disclose financial benefits and leniency on pending cases) and (2) summation misconduct.  *Bellamy v. City of New York*, 914 F.3d 747 (2nd Cir. 2019)[reversing District Court holding, *inter alia*, the prosecutor's failure to disclose $2800 benefit promised to cooperating witness raised a question of fact at to *Monell* liability].

201. Because of  the  K C DAO's policy that insulated  the  trial prosecutor from  the knowledge of the financial and  housing  benefits  that were  conferred  on  witnesses, the  trial prosecutor did  not know  of  the  extensive  benefits given  to  Ms. Rodriguez.

202. As  a  result,  Mr. R o d r i g u e z  was  deprived  of  his  constitutional right  to this specific Brady/Giglio  material.

203. In  1994/1995 the  law  was  well  established  that  such  an  intra-office "wall" would  avoid  disclosing  to  the  trial prosecutor  the  promises  of  benefits  made to witnesses.  This policy was found  to  violate  defendants' constitutional rights. Giglio  v.  U.S., 405  U.S. 150 (1972); People  v.  Novoa, 70 N.Y. 2d  490 (1987).  In the instant case,

204. In  People v. Steadman, 82 N.Y.2d  1 (1993), s i x  years  before  Mr. R o d r i g u e z' s  trial New York's highest Court declared  the  Queens County District Attorney Office's policy of  shielding  trial prosecutors from defendants' promises made to testifying witnesses deprived defendants of their constitutional

right to a fair trial.

205. Thus, the City of New York, and its policy making agents, such as Charles Hynes was on notice that such policy was unconstitutional.

206. Despite the <u>Steadman</u> decision this "Chinese Wall" continued at K C D A O  a t l e a s t  t h r o u g h  the time of Mr. Rodriguez's trial.

207. Upon information and belief, as a result of this policy, numerous defendants were deprived of this specific *Brady/Giglio* material.

208. This "Chinese wall" policy was approved by Charles Hynes, the Kings County District Attorney.

209. In the instant case, for over 15 years, the KCDAO denied that it had provided financial benefits to Ms.Cort.

210. Only after Charles Hynes was voted out of office did the KCDAO disclose it had paid Ms. Cort over $35,000.

211. The line assistant district attorneys were allegedly shielded from this knowledge.

212. Kyle Reeves was supervised by Barry Schreiber at some time during the prosecution of the plaintiff.

213. Barry Schreiber signed multiple checks written to Ms. Cort.

214. Kyle Reeves, due to the policy of the KCDAO of shielding prosecutors, misrepresented to the jury that Ms. Cort had received nothing for her testimony.

215. The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable

to Defendant CITY OF NEW YORK, amounting to deliberate indifference to the constitutional

rights of persons, including Plaintiff, subject to prosecution by the KCDAO, namely:

    a.  The institution and implementation of plainly inadequate or unlawful policies,

        procedures, regulations, practices and/or customs concerning:

        i.  The duty not to use false, misleading or unreliable evidence, testimony,

           statements or arguments during criminal proceedings, including bail

           hearings, pretrial hearings, and trial;

        ii.  The continuing obligation to correct false, inaccurate, incomplete or

           misleading evidence, testimony, statements, and arguments whenever such

           misconduct is discovered, including moving or consenting to overturn

           convictions discovered to have been obtained through such

           unconstitutional means; and

        iii.  The continuing duty to obtain, preserve and make timely disclosure to the

           appropriate parties, including the court and the defense, during criminal

           investigations and prosecutions, of all material evidence or information

           favorable to a person suspected, accused or convicted of criminal conduct,

           including exculpatory evidence as well as evidence impeaching the

           credibility or undercutting the reliability of prosecution witnesses, and

           including verbal as well as recorded information.

    b.  The failure to adequately instruct, train, supervise, and discipline their employees

        with respect to such matters.

216.      The aforesaid deliberate or *de facto* policies, procedures, regulations, practices

and/or customs were implemented or tolerated by policymaking officials for Defendant CITY

OF NEW YORK, including, but not limited to, the District Attorney of Kings County and his delegates, who knew:

   a. To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

   b. That such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

   c. That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

217.    The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

   a. Numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs, had wrongfully withheld evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady* and/or had presented or failed to correct false or misleading testimony and argument (*See* Exh. H for some of these cases);

   b. Civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of criminal activity;

c.  Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with that rule;

d.  Judicial decisions putting the Kings County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, *see e.g., Walker v City of New York*, 974 F2d 293 (2d Cir. 1992); *Ramos v City of New York*, 285 AD2d 284 (1st Dept. 2001), and *Leka v City of New York*, 257 F3d 89 (2d Cir. 2001);

e.  The inherent obviousness of the need to train, supervise, and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

218.  Despite this knowledge, the supervisory and policymaking officials of Defendant CITY OF NEW YORK perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, train, and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead sanctioned or tolerated the policies, procedures, regulations, practices and/or customs, described above, with deliberate indifference to the effect of said policies, procedures, regulations,

practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

219.     The aforesaid policies, procedures, regulations, practices and/or customs of Defendant CITY OF NEW YORK were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

220.     Under the principle of municipal liability for federal civil rights violations, the KCDAO has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable evidence, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

221.     The Kings County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

222.     The District Attorney of Kings County at all relevant times was and is an elected officer of Kings County, one of the constituent counties of Defendant CITY OF NEW YORK, and the Office was and is funded out of the City's budget.

223.     Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (NY County Law §§ 53, 941) that the City's constituent counties, and hence

47

Defendant CITY OF NEW YORK itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

224.     The District Attorney of Kings County, Charles J. Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

225.     During all times material to this Complaint, Defendant CITY OF NEW YORK, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

226.     By virtue of the foregoing, Defendant CITY OF NEW YORK, is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## JURY DEMAND

227.     Pursuant to the powers given Citizens of the United State by virtue of the 7th Amendment of the United States Constitution, the plaintiff demands trial by jury.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.   For damages not less than $50,000,000;

b.   For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

c.   For pre-judgment interest as allowed by law; and

d.  For such other and further relief as this Court may deem just and proper.

Dated:          New York, New York
                October 5, 2021

LAW OFFICES OF ADAM J. ROTH, P.C.

s/
Adam J. Roth, Esq.
*Attorney for Plaintiff*
WILLIAM ERIC RODRIGUEZ
112 Madison Ave, 6th Floor
New York, New York 10016
(212) 922-3741
ajr@loajr.com